IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


CHERYL YVONNE SOBER,
     Plaintiff,

vs.                              Case No.: 5:12cv135/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

     This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 9, 10). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.[2]

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles. The decision of the Commissioner is therefore affirmed.

---

    [1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

    [2] The record reflects that Plaintiff also filed an application for supplemental security insurance ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83 (tr. 152–55; 162–65), but the ALJ's decision and the parties' briefs make no mention of an SSI application. As Plaintiff's SSI application is not at issue in this appeal, the court does not discuss it further.

## I.     PROCEDURAL HISTORY

On May 15, 2008, Plaintiff filed an application for DIB in which she alleged disability beginning June 27, 2007 (tr. 15).[3]  Her application was denied initially and on reconsideration. Thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ"), who conducted a hearing on May 20, 2010, at which Plaintiff, who was represented by counsel, testified; a vocational expert ("VE") also testified.  On September 22, 2010, the ALJ issued a decision in which he found that Plaintiff was "not disabled," as defined under the Act, at any time through the date of his decision (tr. 15–22).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

## II.     FINDINGS OF THE ALJ

In his September 22, 2010, decision the ALJ made the following findings:

1.     Plaintiff meets the insured status requirements of the Act through December 30, 2012.[4]

2.     Plaintiff has not engaged in substantial gainful activity since June 27, 2007, her alleged disability onset date.[5]

3.     Plaintiff has the following severe impairments:  degenerative disc disease and asthma.

4.     Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment.

---

[3] All references to "tr." refer to the transcript of Social Security Administration record filed on August 20, 2012 (doc. 12).  In addition, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

[4] To be qualified to receive DIB, a claimant must accumulate twenty or more calendar "quarters of coverage" within the forty calendar quarters prior to filing for benefits.  42 U.S.C. § 423(c)(1)(B)(i).  A "quarter of coverage" is a period of three months during which one earns a certain amount of money in either wages or self-employment income.  42 U.S.C. § 413(a).  Pursuant to § 413(a)(1), "[t]he term 'quarter', and the term 'calendar quarter', mean a period of three calendar months ending on March 31, June 30, September 30, or December 31." (emphasis added). Accordingly, in this case it appears the ALJ's decision contains a clerical error with respect to the date through which Plaintiff meets the insured status requirements of the Act.  Based on § 413(a)(1), the date should be December 31, 2012, rather than December 30, 2012.

[5] The relevant period in this case therefore is June 27, 2007 (date of alleged disability onset), through September 22, 2010 (date of the ALJ's decision), even though Plaintiff is insured for DIB purposes through December 2012.

Case No.: 5:12cv135/EMT

5.      Plaintiff has the residual functional capacity ("RFC") to perform light work, with certain restrictions.[6]

6.      Plaintiff is capable of performing her past relevant work as a manger (retail store), work that does not require the performance of activities precluded by her RFC.

7.      Plaintiff has not been under a disability, as defined in the Act, from June 27, 2007, through the date of the decision.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

Plaintiff is restricted to lifting and carrying twenty pounds occasionally and ten pounds frequently (tr. 18).  Plaintiff can sit for six hours and stand for six hours in an eight-hour workday.  Plaintiff cannot climb.  Plaintiff should not perform tasks involving hazards or unprotected heights.  Plaintiff can occasionally balance, stoop, kneel, crouch and crawl.  Plaintiff should have only occasional exposure to pulmonary irritants and chemicals.  Plaintiff can frequently perform gross manipulation tasks bilaterally.  Plaintiff can frequently perform fine manipulation tasks bilaterally.  Plaintiff is limited to occasional exposure to wetness and humidity.

842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[7] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

---

[7] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     HEARING TESTIMONY AND MEDICAL HISTORY[8]

        A.     Hearing Testimony

        Plaintiff testified at the May 20, 2010, administrative hearing that she is 5'5" and weighs 212 pounds (tr. 31). Born on June 16, 1959, Plaintiff was fifty years of age at the time of the hearing (id.). Plaintiff stated that she has a Florida driver's license and drives "around town" (tr. 32). She completed the tenth grade and later obtained a General Equivalency Diploma (id.). Her past work includes jobs as a shoe salesperson and a retail store manager (tr. 34–37).

        Plaintiff stated that she stopped working after being involved in an automobile accident in June 2007 which caused a whiplash injury to her neck and the aggravation of a pre-existing back problem (tr. 33). According to Plaintiff, she suffers constant, severe pain in her back and legs (tr. 33; 42–43); pain in her neck (tr. 33; 44); and pain, numbness, and cramping in her hands (tr. 44–45). Plaintiff stated that she had been seeing "Dr. Stringer . . . [for her back problems] under workman's comp and then I settled . . . with workman's comp last year and I haven't seen him since" (tr. 39). Plaintiff explained that she had spent most of the $8000.00 in the Worker's Compensation settlement money on dental expenses rather than on continued treatment with Dr. Stringer because she had limited funds (tr. 41); also, she could obtain pain and muscle relaxant medications (which she "live[s] on" (tr. 40)) from a different physician, Dr. Sullivan (tr. 39). Additionally, the treatments from Dr. Stringer, which consisted mainly of repeated injections, had only helped her "for a little while and that's it" (tr. 40). Plaintiff agreed that she had continued under Dr. Stringer's care only until reaching a settlement with

---

[8] The information in this section is largely derived from references to the record contained in the ALJ's opinion and the parties' briefs.

Worker's Compensation because, as the ALJ put it, "somebody else was paying the bill" (*id.*). In addition to her neck and back problems, Plaintiff has shortness of breath; she has been told to stop smoking but admits she continues to smoke one pack of cigarettes per day (tr. 41). According to Plaintiff, her breathing problems are exacerbated by strong smells, exertion, and extreme temperatures (tr. 52).

With respect to her daily activities, Plaintiff testified that she shops, cooks and bakes, does laundry, and goes to bingo about once a week (tr. 46–47). She does not do any cleaning or yard work (tr. 47). Plaintiff does not regularly participate in social activities outside her home (tr. 48). In May 2010 Plaintiff traveled from Chipley, Florida, to Pensacola, Florida, to attend her son's graduation (tr. 47), and in 2008 she accompanied her family on a trip to Pennsylvania (tr. 48). She has not recently traveled outside her local area, other than to attend doctors' appointments in Panama City, Florida (*id.*). Plaintiff does not exercise, but she does walk the family's dog twice a day on a leash in her yard (*id.*). Plaintiff is able to walk up to an hour if she is able to hold onto something (tr. 46) but otherwise can only stand approximately fifteen to thirty minutes, with some movement (tr. 50).

After Plaintiff's testimony concluded, the ALJ posed several hypothetical questions to the VE. In the first hypothetical question, the ALJ asked the VE to assume an individual of the same age and education as Plaintiff with a similar vocational background (tr. 57). The individual could lift up to twenty pounds occasionally and lift up to ten pounds frequently; in an eight-hour work day she could sit six hours and stand six hours (*id.*). The individual could never climb and could occasionally balance, stoop, kneel, crouch, and crawl (*id.*). She could never be exposed to heights or hazards (*id.*). She could only occasionally be exposed to pulmonary irritants, chemicals, and wetness and humidity (tr. 57–58). The individual was capable of frequent gross and fine manipulation bilaterally (tr. 58). The VE testified that such an individual would be able to perform the work activities required of a retail store manager, as defined in the Dictionary of Occupational Titles (*id.*). She would not be able to perform the work activities required of a shoe salesman (*id.*).

B.     Relevant Medical History

1.     Treating Sources

The transcript contains numerous records from neurologists Douglas L. Stringer, M.D., and Merle P. Stringer, M.D. For the sake of simplicity, the court refers to these physicians as one individual, "Dr. Stringer"[9] (tr. 39; 519).[10]

In February 2006 Plaintiff underwent an electromyogram and nerve conduction velocity ("EMG-NCV") study. The NCV study of the right leg was normal (tr. 290). The EMG study of the back muscles revealed findings "consistent with posterior primary rami root irritation in the lower lumbar paraspinous region suggestive of radiculopathy"; clinical correlation was suggested (*id.*). Also in February 2006, magnetic resonance imaging ("MRI") of the lumbar spine showed degenerative changes, facet hypertrophy of L4-5 and L5-S1, and a possible small synovial cyst; lumbar x-rays were normal (tr. 518). In a June 2006 examination, Dr. Stringer found marked tenderness in the mid and lower lumbar area, marked muscle spasm, and limited bending (*id.*). Straight leg raising resulted in low back and SI [sacroiliac] joint pain, with no radicular component (*id.*). Dr. Stringer diagnosed Plaintiff with "[l]umbar disc disease, low back pain, no evidence of nerve root compression" and "[l]umbar fact pain, with trigger point tenderness, SI pain, worst pain is the SI pain" (*id.*). Some improvement reportedly resulted from the facet injection Plaintiff underwent in July (tr. 516). In August 2006 Dr. Stringer found evidence of paravertebral muscle spasm, with some moderate limitation of flexion and extension due to low back pain that was nonradicular (tr. 512). Straight leg raising resulted in mild low back pain (tr. 511). Plaintiff wished to proceed with SI joint and lumbar trigger point injections (*id.*). In November 2006 Dr. Stringer noted that Plaintiff's pain reportedly had decreased following the injections "from a 9 to a 2" (tr. 502). Plaintiff reported an increase in back pain in December 2006 (tr. 501). Noting parasthesias, pain, and numbness in Plaintiff's left leg and foot, Dr. Stringer recommended EMG-NCV studies and the use of pain and muscle relaxant medications (tr. 499).

---

[9] Dr. Merle P. Stringer and Dr. Douglas L. Stringer work in the same facility. Plaintiff saw each of them frequently and, it appears, interchangeably as their records are co-mingled. For these reasons, the court does not distinguish between the two physicians in describing the treatment she received from them.

[10] The date of the first office treatment note by Dr. Stringer that is included in the transcript appears to be May 2006 (tr. 519). Plaintiff was last seen by Dr. Stringer in May 2009 (tr. 788–90) but apparently was considered to be a patient at least until July 2009 (*see* tr. 787). The record also reflects that Plaintiff reached a settlement with Worker's Compensation in June 2009, which was finalized in August 2009 (*see*, *generally*, tr. 126–51).

In January 2007, Dr. Stringer noted that an EMG-NCV study of Plaintiff's left leg performed in December 2006 was normal, with no evidence of nerve root compression (tr. 495; 287 (stating there was no "evidence of lumbosacral radiculopathy")). Physical examination revealed moderate tenderness in the lumbar area and both SI joints and moderate muscle spasm (tr. 495). Forward bending was 70% of normal, and straight leg raising caused low back pain (*id*.). Plaintiff reported improvement following physical therapy and the use of a transcutaneous electrical nerve stimulation ("TENS") device (tr. 496). Plaintiff reported increased pain, mostly in the low back, in February 2007 and March 2007 (tr. 490; 492). An MRI obtained in March 2007 showed minimal facet degenerative changes at L4-5 and L5-S1, with no nerve root compression (tr. 486). Physical examination showed back tenderness, some paravertebral muscle spasm, and moderate limitation of flexion and extension due to pain that was nonradicular (tr. 489). On a follow-up visit in April 2007 Plaintiff reported that her back pain was worse with increased activity and the traveling required of her job (tr. 487). Dr. Stringer found moderate tenderness and muscle spasm in the lumbar spine and moderate tenderness over the SI joints (tr. 486). Forward bending was good at 70% of normal; straight leg raising caused low back pain with no radicular component (*id*.). In May 2007 Plaintiff reported some low back pain to Dr. Stringer (tr. 485), who noted that Plaintiff was able to work and should continue doing her back exercises on a daily basis (tr. 483).

On June 26, 2007, the date Plaintiff alleges she became disabled, Plaintiff was involved in what was described in a hospital emergency room report as a slow speed motor vehicle accident resulting in mild property damage in which her car was rear-ended by another vehicle (tr. 309). Plaintiff initially reported moderate pain; an examination was mostly normal, other than a finding of back tenderness (*id*.). Plaintiff presented to Dr. Stringer shortly after the accident with complaints of pain in her arms, neck, back, and legs; thoracic pain; and paresthesias of the upper extremities (tr. 482). Radiographs taken in June 2007 revealed minimal spondylosis of Plaintiff's thoracic spine and "very minimal" spondylosis of her cervical spine (tr. 293). Lumbar spine x-rays showed degeneration but no acute changes (tr. 480). Dr. Stringer recommended that Plaintiff attend outpatient physical therapy, "stay off of work," and obtain various radiological studies (*id*.). An MRI of the cervical spine revealed some mild disc bulge at C4-5 but was otherwise unremarkable; there was no significant nerve root compression or spinal stenosis (tr. 477). An MRI of the lumbar spine was normal (*id*.). A NCV study obtained in early July 2007 was indicative of bilateral carpal tunnel

syndrome, worse on the right; clinical correlation was suggested (tr. 284). An EMG study of both upper extremities that was conducted several weeks later was normal and showed no clear evidence of cervical radiculopathy (tr. 607).

During a July 2007 visit to Dr. Stringer, Plaintiff again complained of pain in her neck, arms, lower back and legs, as well as numbness and tingling in her hands (tr. 479). On examination, Dr. Stringer found some evidence of paracervical muscle spasm of the neck, with moderate limitation of flexion and extension (*id.*). Tinel's sign and Phalen's manuever were positive[11] (tr. 478). There was some evidence of thoracic and lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Among other recommendations, Dr. Stringer encouraged Plaintiff to follow through with physical therapy, to wear bilateral wrist splints at night, and to remain off work until she returned in two weeks (tr. 477). Plaintiff continued to complain of pain when she saw Dr. Stringer on her next visit (tr. 476). He recommended that she continue with physical therapy and that she stay off work for one more week, then return to half-days on light duty (tr. 474). Dr. Stringer also prescribed pain and muscle relaxant medications (*id.*). In August 2007 Plaintiff reported to Dr. Stringer that she was still off work because her employer was not willing to have her work half-days (tr. 473). On examination, Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of flexion and extension (tr. 472). Extremities had good peripheral pulses; there was no mention of positive tests for carpal tunnel syndrome (*id.*). There was some evidence of thoracic and lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Dr. Stringer noted that Plaintiff continued to be symptomatic although she had improved with physical therapy (tr. 471). Also in August 2007 Dr. Stringer recommended a series of cervical facet injections, following which he advised Plaintiff to try to return to work (tr. 468). Plaintiff reported in September 2007 to Dr. Stringer that her neck pain was significantly improved but

---

[11] The website of the U.S. National Library of Medicine, National Institutes of Health, states that Tinel's sign and Phalen's test "are two provocative tests used in the diagnosis of carpal tunnel syndrome." *See* http://www.ncbi.nlm.nih.gov/pubmed/1461811 (last visited September 18, 2013).

her back pain had increased (tr. 467). Dr. Stringer recommended that Plaintiff undergo lumbar facet injections (tr. 323).

A discharge note dated October 22, 2007, from the Northwest Florida Wellness Center, where Plaintiff was given physical therapy from July to September 2007 (tr. 310–13), indicates good progress with respect to neck pain but low back pain that had not changed and continued to be problematic (tr. 311).

In November 2007 Plaintiff presented for a follow-up visit to Dr. Stringer, reporting neck pain and low back pain which had improved with lumbar facet injections (tr. 464). On examination, Dr. Stringer found marked tenderness of the neck, with increased pain on extension (*id.*). Extremities had good peripheral pulses, with no mention of positive tests for carpal tunnel syndrome (*id.*). There was moderate tenderness to palpation in the mid and lower lumbar area and both SI joints, with moderate muscle spasm and good forward bending to 70% of normal (*id.*). Straight leg raising caused low back and SI joint pain, with no radicular component (*id.*). Dr. Stringer prescribed medications for pain and muscle spasms and advised a return visit in one month (tr. 463).

In January 2008, Plaintiff reported to Dr. Stringer that she was experiencing pain in her neck, upper and lower extremities, and low back; she also had some numbness of the hands and feet (tr. 462). On examination, Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of flexion and extension (tr. 461). Extremities had good peripheral pulses; there was no mention of positive tests for carpal tunnel syndrome (*id.*). There was some evidence of paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). A neurological examination was unremarkable (*id.*). Dr. Stringer indicated that trigger point injections of the SI and lumbar spine would be scheduled (tr. 460). After completing the injections Plaintiff reported to Dr. Stringer in March 2008 that her back pain had diminished from "a 10 to about a 3–4," though she still had some pain in her neck and arms and numbness of the hands and feet (tr. 454). Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of flexion and extension (*id.*). Extremities had good peripheral pulses (tr. 453). There was some evidence of thoracic and lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Plaintiff did not want to try further

physical therapy but did want to undergo cervical injections.  Dr. Stringer advised her to continue her neck and back exercises daily, prescribed pain and muscle relaxant medications, and agreed to schedule cervical facet injections (tr. 452).  Plaintiff was seen by Dr. Stringer in April 2008, when Dr. Stringer noted that the cervical facet injections had been effective in decreasing Plaintiff's neck pain "from a 9.5 to a 10 to approximately a 3" (tr. 450); he recommended continuing the injections and he also prescribed pain and muscle relaxant medications (tr. 449).  Following an additional injection Plaintiff's neck pain reportedly was approximately "a 2–3" (tr. 446).  Dr. Stringer agreed to continue the cervical facet injections (tr. 444).  In May 2008, after a third cervical facet injection, Plaintiff's neck pain was described by Dr. Stringer as being "about a 3–4"; she had some lower back pain but no radicular leg pain (tr. 440).  Dr. Stringer found some evidence of paracervical muscle spasm on examination of Plaintiff neck, with moderate limitation of flexion and extension (*id.*).  Extremities had good peripheral pulses, and there was no mention of positive tests for carpal tunnel syndrome (tr. 441).  There was evidence of paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*).  Straight leg raising tests resulted in some mild low back pain (*id.*).  Dr. Stringer again agreed to continue the injections as Plaintiff requested (tr. 442).  Dr. Stringer noted in June 2008 that Plaintiff had completed her cervical facet injections with an overall improvement in neck pain (tr. 578).  She also reported some pain involving her low back but no radicular leg pain (*id.*).  Plaintiff advised Dr. Stringer that she was in the process of filing for Social Security disability.  Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of neck flexion and extension (*id.*).  He also found paravertebral muscle spasm, with moderate limitation of back flexion and extension that was nonradicular (tr. 577).  Straight leg raising resulted in mild low back pain (*id.*).  Dr. Stringer prescribed medications for pain and muscle spasms (*id.*).  Several weeks later, when Plaintiff again saw Dr. Stringer, he noted that her neck pain was "much better" but that she had increasing pain in her back and muscle spasms (tr. 576).  Dr. Stringer recommended lumbar facet injections (tr. 572).  He also advised that a functional capacity evaluation ("FCE") that had been completed in February 2008 be repeated as the examiner felt Plaintiff had "not exhibit[ed] maximum effort" (*id.*).

In July 2008 Plaintiff underwent the FCE advised by Dr. Stringer (tr. 567–71).  The examiner reported that Plaintiff had given "maximum, consistent effort" (tr. 567).  The FEC report indicates that

Plaintiff's work capabilities met the light to low medium physical demand level, except for overhead lifting and right-handed carrying (tr. 567).[12]

Plaintiff saw Dr. Stringer a few days after completing the July 2008 FCE, at which time Dr. Stringer released Plaintiff to return to light-duty work within the restrictions designated in the FCE (tr. 564). On examination, Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of flexion and extension (tr. 566). Extremities had good peripheral pulses, with no mention of positive tests for carpal tunnel syndrome (tr. 565). There was evidence of lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Dr. Stringer prescribed medications for pain and muscle spasms (tr. 564). He noted that Plaintiff had reached maximum medical improvement with a 3% impairment rating to the whole person based on her cervical spine symptomatology and a 3% impairment to the whole person based on her lumbar spine impairment, for a total of a 6% impairment rating for Worker's Compensation purposes (*id.*). In August 2008 Plaintiff reported to Dr. Stringer improvement in her back pain following a lumbar facet injection (tr. 561). Plaintiff wished to continue the lumbar injections, and Dr. Stringer agreed to schedule them (tr. 559). He also prescribed pain and muscle relaxant medications (*id.*). He noted Plaintiff was not working (tr. 556). By early September 2008 Plaintiff had completed her lumbar facet injections "with improvement in her back pain"; she experienced only occasional leg pain and some pain in the SI joints (tr. 551). On physical examination, Dr. Stringer found some evidence of paracervical muscle spasm, with moderate limitation of flexion and extension (*id.*). Extremities had good peripheral pulses; there was no mention of positive tests for carpal tunnel syndrome (tr. 550). There was some evidence of lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension, secondary to pain which was nonradicular (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Dr. Stringer agreed to continue the injections and prescribed pain and muscle relaxant medications (tr. 549). At her second September 2008 visit, Plaintiff reported increased back and leg pain (tr. 546). On examination, Dr. Stringer found mild to moderate tenderness

---

[12] The FCE also limits Plaintiff's crawling, standing, and stair climbing to a maximum of 2/3 of the workday; kneeling is limited to 1/3 of the workday (tr. 570). Plaintiff can perform the following tasks up to 100% of the workday: sitting, walking, stepladder climbing, balancing, and right and left upper extremity coordination (Plaintiff was not able to complete the assessment for crouching and squatting due to lower back pain and leg pain) (*id.*).

to palpation of the cervical spine, with mild to moderate muscle spasm; neck movement was 70% of normal (tr. 547). Extremities had good peripheral pulses, with no mention of positive tests for carpal tunnel syndrome (*id.*). There was minimal tenderness in the thoracic area of the spine, with no muscle spasm and flexion and extension 80–90% of normal (*id.*). There was marked tenderness in the lumbar area and marked muscle spasm, with bending and extension significantly restricted (*id.*). Straight leg raising tests resulted in low back pain (*id.*). Dr. Stringer recommended outpatient physical therapy, an MRI scan of the lumbar spine, and an EMG-NVC study of the lower extremities (tr. 548).

In early October 2008 Plaintiff complained of back and leg pain and paresthesias in her lower extremities, neck and arm pain, headaches, and muscle spasm (tr. 543). On examination, Dr. Stringer found marked tenderness of the cervical spine and limitation of range of motion of the neck to 60% of normal (tr. 544). There was minimal tenderness of the thoracic spine and mild tenderness of the lumbar spine (*id.*). Bending was 80% of normal with very little pain on extension; there was marked tenderness over the SI joints and marked lumbar paraspinous muscle tenderness (*id.*). Straight leg raising tests resulted in low back and SI joint pain (*id.*). Dr. Stringer recommended lumbar, SI, and trigger point injections; he also prescribed pain and muscle relaxant medications (tr. 545). An EMG-NCV study taken in late October 2008 was normal, with no clear electro-physiological evidence of a lumbosacral radiculopathy (tr. 777). An MRI of the lumbar spine showed no focal disc protrusion, spinal canal compromise, or foraminal stenosis (tr. 778). There was early degenerative disease at levels L3-4 and L4-5, with suspected subtle annular tears at those levels (*id.*). Plaintiff reported less back pain at a November 2008 visit (tr. 775); her physical therapy and medications were continued (tr. 773), and a few days later she underwent an additional lumbar injection (tr. 777). Dr. Stringer diagnosed probable carpal tunnel syndrome in November 2008 (tr. 768). His physical examination revealed positive signs for carpal tunnel syndrome (tr. 769). There was moderate tenderness in the lumbar area and moderate muscle spasm, with good forward bending (*id.*). Straight leg raising tests resulted in some mild low back pain (*id.*). Following facet and SI joint injections, Plaintiff reported a dramatic improvement in her back and leg pain (tr. 765). Additional injections were planned (tr. 763). After two more lumbar injections, Plaintiff reported in December 2008 to Dr. Stringer that she had minimal back pain and no leg pain (tr. 760). She also had no numbness, weakness, or paresthesias. She could stand, sit, and walk more with less discomfort and required less medication

(tr. 703).  There is no mention of findings or symptoms related to carpal tunnel syndrome (*id.*).  An EMG/NCV study of the lower extremities was normal (tr. 701).

In January 2009 Plaintiff complained of pain in her back and legs (tr. 703).  Examination revealed marked tenderness and muscle spasm in the cervical spine, with good range of motion (tr. 701).  There was also marked tenderness and muscle spasm in the lumbar area and both SI joints (*id.*).  Straight leg raising caused back pain and right leg pain (*id.*).  Dr. Stringer recommended lumbar diagnostic facet block injections (tr. 700).  After the lumbar diagnostic facet block injections Plaintiff exhibited a "dramatic improvement" in February 2009 (tr. 751).  Neurological and extremities examinations were unremarkable, including no mention of any findings related to carpal tunnel syndrome (tr. 750).  There was minimal tenderness and muscle spasm in the cervical spine and good range of motion of the neck (*id.*).  There was marked tenderness in the lumbar area and both SI joints, however, as well as marked muscle spasm; bending was significantly restricted (*id.*).  Straight leg raising caused low back and SI joint pain, without radiculopathy (*id.*).  More injections were planned (tr. 695).  Improvement was again noted in March 2009 after additional injections (*id.*); Plaintiff wished to proceed with radio frequency thermocoagulation lesioning for her lumbar pain on the right side, as well as SI joint and right lumbar trigger point injections (tr. 690).  On examination, Dr. Stringer made no findings concerning the cervical spine; he noted evidence of lumbar paravertebral muscle spasm and SI joint tenderness, with moderate limitation of flexion and extension (tr. 692).  Straight leg raising tests resulted in mild low back pain in the sitting position (*id.*).  There is no mention of positive findings related to carpal tunnel syndrome (tr. 693).  After undergoing thermocoagulation lesioning therapy Plaintiff reported significant improvement in her right-side back pain but pain in both SI joints and left-side lumbar pain remained, with occasional leg pain (*id.*).  Plaintiff wished to proceed with right-side SI and trigger point injections as well as left-side lumbar diagnostic facet blocks (tr. 684).  She was also prescribed pain medications (*id.*).   Plaintiff's right-side facet and SI joint pain was significantly decreased in April 2009 following the injections, but she still had some pain; she also had moderate to severe SI joint and facet pain on the left side (tr. 737; 738).  Dr. Stringer reported that Plaintiff would follow through with the left and right-side trigger point injections and left-side SI joint injections and undergo diagnostic facet blocks on the left side (tr. 736).  After her injections and radiofrequency thermocoagulation therapy, during another April

2009 visit to Dr. Stringer Plaintiff reported very little pain on the right side (tr. 733). Plaintiff's "main difficulty now is pain in her left side," but the recommended diagnostic lumbar facet blocks had not yet been authorized (*id.*). Examination of the cervical spine revealed minimal tenderness and muscle spasm; there was also minimal tenderness of the thoracic area without muscle spasm and good flexion and extension (tr. 732). There was moderate tenderness in the lumbar spine and both SI joints, with muscle spasm that was worse on the left and minimal on the right (*id.*). Lumbar flexion was 50–60% of normal, with lateral bending and extension 20% of normal (*id.*). Straight leg raising caused low back and SI joint pain, with no radicular component (*id.*). There was no mention of a diagnosis of carpal tunnel syndrome (tr. 731). Dr. Stringer prescribed pain medication and discontinued Plaintiff's muscle relaxant medication; he also noted that Plaintiff would contact her insurance company to obtain authorization for the left-side diagnostic lumbar facet blocks (tr. 731). In May 2009 Plaintiff reported some pain involving her low back and right foot and some foot numbness (tr. 790). Dr. Stringer did not record any findings with respect to the cervical spine; as to the lumbar spine he found some evidence of lumbar paravertebral muscle spasm, with moderate limitation of flexion and extension and lateral rotation, secondary to pain which was nonradicular (tr. 789). Plaintiff was tender in the left SI joint and lumbar facet joints, with increased discomfort on extension and bending to the left (*id.*). Straight leg raising tests resulted in some mild low back pain and right leg pain (*id.*). Carpal tunnel syndrome is not included among Plaintiff's diagnoses (tr. 788). Dr. Stringer indicated that Plaintiff wished to proceed with a diagnostic left lumbar facet block (*id.*). Plaintiff was to work with her attorney to try to obtain authorization for these procedures (*id.*). Additional notations, in late May 2009 to early July 2009 indicate that Plaintiff had called about her medications but had not come in for examinations; additionally, the records reflect that Dr. Stringer's office had contacted Worker's Compensation for authorization of Plaintiff's lumbar injections but the calls had not been returned (tr. 787).

The record contains a pre-printed Clinical Assessment of Pain ("CAP") form which is undated and bears an illegible signature with no printed name below it to clearly identify the signer (tr. 785). The CAP was supplied to the Office of Disability and Adjudication and Review by Plaintiff's counsel on May 11, 2009 (tr. 784), and the signature appears to match others belonging to Dr. Douglas Stringer (*see* tr. 785; 495; 499). The court therefore assumes that the CAP was prepared

in approximately May 2009 by Dr. Douglas Stringer.[13]  In response to the question, "To what extent is pain of significance in the treatment of this patient?" Dr. Stringer circled the response indicating that Plaintiff had pain to such an extent as to be distracting to adequate performance of daily activities or work.  Dr. Stringer also circled the response that indicated physical activity (such as walking, standing, sitting, bending, stooping, moving of extremities, etc.) would greatly increase Plaintiff's pain and to such a degree a to cause distraction from tasks or total abandonment of task (tr. 785).  Dr. Stringer also indicated that the side effects of prescribed medication would present some limitations but not to such a degree as to create serious problems in most instances (*id.*).

Plaintiff also was treated by general practitioner James S. Sullivan, M.D., apparently some time prior to December 2004 through February 2010 (*see* tr. 392; 804).  Dr. Sullivan's records reflect that he assessed Plaintiff with various ailments, including flu symptoms in January 2005 (tr. 392); acute asthmatic bronchitis and laryngitis in November 2005, April 2006, and October 2006 (tr. 390–91; 387; 388); and sinus congestion in February 2006 (tr. 390).  Dr. Sullivan also noted in October 2006 that Plaintiff had degenerative disc disease of the lumbar spine with sciatica but there is no indication he evaluated or treated her for this condition on that date (tr. 387).  In April 2007 Dr. Sullivan treated Plaintiff for chest pain (tr. 386), again noting that she had lumbar disc disease and also noting that she was obese (*id.*).  When Plaintiff injured her right elbow in a fall in April 2007, Dr. Sullivan ordered an x-ray and prescribed pain medication (tr. 385).  Plaintiff next saw Dr. Sullivan in January 2008, when he assessed atypical pneumonia (tr. 384).  A February 2008 office note reflects that Plaintiff was doing well at that time but had been hospitalized with bilateral pneumonia and adult respiratory distress syndrome after her previous office visit; while hospitalized Plaintiff was diagnosed with diabetes, which would be monitored (*id.*).

The next office note from Dr. Sullivan is dated November 2008, when he diagnosed Plaintiff with asthmatic bronchitis and sinusitis (tr. 729).  In April 2009 Dr. Sullivan assessed Plaintiff with chronic asthmatic bronchitis; chronic cigarette abuse; hypotension; and lumbar disc disease with

---

[13]  In her memorandum the Commissioner makes no mention of Dr. Douglas Stringer, referring only to Dr. Merle Stringer.  She also appears to conclude that Dr. Stringer completed a CAP on April 14, 2009, and Dr. Sullivan completed one on May 11, 2009 (*see* doc. 21 at 9).  It seems these dates should be reversed.  In any event, the parties appear to agree that either Dr. Douglas Springer or Dr. Merle Springer prepared a CAP for Plaintiff and did so in April or May 2009.

degenerative arthritis, chronic sciatica, and disabling pain. Dr. Sullivan noted Plaintiff's subjective complaints concerning her back, her description of her back condition and limitations, and her statements that she had "been disabled since she was in a car accident in 2004 with lumbar disc disease" and was applying for disability benefits (*id.*). Dr. Sullivan conducted a general examination, noting some upper respiratory tract symptoms as well as tenderness of the lumbosacral area and positive straight leg raising tests bilaterally (*id.*). Plaintiff's deep tendon reflexes were decreased, and Dr. Sullivan noted that Plaintiff was unable to get on or off the table without severe pain and, although ambulatory, she "seem[ed] to be in pain [in] just a short distance" (*id.*). Dr. Sullivan prescribed steroid and antibiotic medications, as well as medications for Plaintiff's asthma (*id.*). He noted that he had completed disability forms and that he recommended Plaintiff be approved "for chronic disability" (*id.*).

One of the disability forms completed by Dr. Sullivan on April 14, 2009, is a CAP form, the same pre-printed form completed by Dr. Springer (tr. 727). Dr. Sullivan indicated that pain "is present to such an extent as to be distracting to adequate performance of daily activities of work" (*id.*); that physical activity greatly increased the degree of pain (*id.*); and that the side effects of prescribed medication could be expected to be severe and to limit effectiveness due to distraction, drowsiness, etc. (*id.*). Dr. Sullivan also completed a pre-printed Physical Capacities Evaluation ("PCE") for Plaintiff (tr. 728). He opined that Plaintiff could only lift five pounds occasionally and one pound frequently, and she could sit two hours in an eight-hour workday. She could never push/pull with her arms or legs; climb; perform gross or fine manipulation; bend; stoop; be exposed to environmental hazards; operate motor vehicles; or work around hazardous machinery (*id.*). Plaintiff could rarely reach (*id.*). She would likely miss more than four days of work per month due to her impairments (*id.*). Dr. Sullivan did not complete the section of the form that asked him to explain and describe the degree and basis for the restrictions he had checked.

Plaintiff next presented to Dr. Sullivan in October 2009 for asthmatic bronchitis, and he prescribed various medications for this condition as well as an antidepressant (tr. 799). Plaintiff obtained a flu vaccination in October 2009 (tr. 806). In January 2010 she called in to report that the pain medication she was taking did not help her back and leg pain very much. Dr. Sullivan apparently authorized the use of Darvocet only (*id.*). Dr. Sullivan saw Plaintiff twice in January 2010, once for

acute gastritis (tr. 805) and once for asthmatic bronchitis and laryngitis (*id.*). These records reflect that he prescribed medications for Plaintiff's gastric and respiratory conditions. Notes from February 2010 reflect that Plaintiff called in to inquire about her medications, including to request a prescription for more than twenty Darvocet tablets at a time; her prescription was increased to thirty tablets (*id.*). Also in February 2010 Plaintiff obtained refills for several medications from Dr. Sullivan, including a muscle relaxant (tr. 804).

   2.  Non-Treating Sources

  On August 7, 2008, Jerold A. Derkaz, M.D., examined Plaintiff consultatively after reviewing the records of Dr. Stringer (tr. 520–27). Dr. Derkaz noted that Plaintiff's height was 5.42 inches and her weight was 202.01 pounds, resulting in a body mass index ("BMI") of 33.57 (tr. 522).[14] Based on his review of the records, Dr. Derkaz' diagnoses included distant history of respiratory arrest; severe chronic obstructive pulmonary disease; diabetes mellitus; cervical disc disease; lumbar degenerative disc disease; bilateral carpal tunnel syndrome; hypertension; and obesity (tr. 523). Dr. Derkaz' physical examination of Plaintiff's back was unremarkable, with the exception of tenderness to moderate palpation over L4 to S1 with a slight decrease in forward flexion and positive straight leg raising (*id.*). Range of motion in the cervical and lumbar spine was normal (tr. 525). Dr. Derkaz stated that he agreed with the functional restrictions imposed by Dr. Stringer, which he described as including the inability to lift more than ten pounds; additionally, Dr. Derkaz agreed that Plaintiff should not squat, climb, bend repetitively, push, pull or engage in overhead work[15] (tr. 524). He also opined that Plaintiff should be limited to sitting, standing, and walking for periods no longer than thirty minutes (tr. 524).

---

[14] The website of the Centers for Disease Control and Prevention provides a BMI scale which shows that a BMI of 30.0 and above results in a weight status of "obese." www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited September 18, 2013).

[15] Plaintiff does not point to, nor could the court locate, where in the record such restrictions—imposed at the express direction of Dr. Stringer—could be found. The ALJ notes, correctly it seems, that when Dr. Derkaz prepared his assessment in August 2008 the only functional restrictions made by a treating doctor were those set by Dr. Stringer based on the July 2008 FCE (tr. 20). The only reference to lesser restrictions given by Dr. Stringer that the court could find in the transcript were those reported by Plaintiff in a May 2008 pain questionnaire (*see* tr. 196).

Robert Steele, M.D., a non-examining consultant, completed a RFC assessment of Plaintiff on August 15, 2008 (tr. 533–40). Dr. Steele concluded that Plaintiff was capable of occasionally lifting and/or carrying twenty pounds and frequently lifting and/or carrying ten pounds (tr. 534). She could sit, stand and/or walk about six hours in an eight-hour workday (*id.*). She had no limitations with respect to pushing or pulling (*id.*). Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and occasionally climb ladders, ropes, and scaffolds (tr. 535). She had no manipulative, visual, communicative, or environmental limitations (tr. 536–37).

A second non-examining consultant, Edward Holifield, M.D., prepared an RFC assessment of Plaintiff on December 3, 2008 (tr. 675–82). Dr. Holifield determined that Plaintiff was capable of occasionally lifting and/or carrying twenty pounds and frequently lifting and/or carrying ten pounds (tr. 676). She could sit, stand and/or walk about six hours in an eight-hour workday (*id.*). Dr. Holifield imposed no limitation on Plaintiff's pushing or pulling, but he limited Plaintiff to only occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling (tr. 677). Plaintiff should never climb ladders, ropes, or scaffolds (*id.*). Plaintiff should avoid concentrated exposure to humidity and fumes, odors, dusts, gases, and poor ventilation (tr. 679).

V.   DISCUSSION

Plaintiff's grounds for relief, in the order in which the court addresses them, are that the ALJ erred by (1) failing to consider whether her condition of obesity was a severe impairment; and (2) failing to properly evaluate the disability opinions of treating physicians Dr. Sullivan and Dr. Stringer. Plaintiff seeks reversal and remand for an award of benefits or, alternatively, for further proceedings. The Commissioner responds that the decision denying benefits should be affirmed as there was no reversible error in the ALJ's failure to include Plaintiff's obesity as a severe impairment or in his assessments of the opinions of Dr. Sullivan and Dr. Stringer.

1.   Obesity as a Severe Impairment

Plaintiff submits that the following evidence documents her struggle with obesity: from Dr. Derkaz reflecting that at 202 pounds she had a BMI that placed her in the classification of "obese"; from Dr. Stringer showing that her weight was as high as 217 pounds, that he routinely described her as "somewhat overweight," and that he repeatedly advised her to reduce her weight; and from the hearing when she testified that her weight was 212 pounds. According to Plaintiff, based on this

evidence the ALJ should have found her obesity to be a severe impairment and should have considered the limitations this impairment imposes in assessing her RFC.

At step two of the sequential analysis, the ALJ must determine whether a claimant's impairments are severe. *See* 20 C.F.R. § 404.1520. This is a "threshold" inquiry that allows only claims based on the slightest abnormality to be rejected. Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Id.* Nevertheless, the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement at step two. Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987). Furthermore, as with other impairments, obesity is a severe impairment only if the record evidence demonstrates that it affected Plaintiff's ability to perform basic work activities. *See* McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

In this case, although the Commissioner contends that no physician ever diagnosed Plaintiff with obesity, that is not correct. The examining physician, Dr. Derkaz, diagnosed obesity as did treating physician Dr. Sullivan, each on one occasion (tr. 386; 523).[16] A diagnosis of obesity alone, however, does not equate with a finding of severity. *See, e.g.*, Wind v. Barnhart, 133 Fed. App'x 684, 690–91 (11th Cir. 2005) (concluding that ALJ correctly determined obesity was non-severe because it did not cause further reduction in plaintiff's RFC). Other than speculatively, Plaintiff has not alleged—and she has not demonstrated—that her obesity affects her ability to perform basic work activities or that the condition in combination with her back impairment and asthma affect her functional ability. Additionally, Plaintiff points to nothing in the record which indicates that a physician imposed functional restrictions based on her weight. Nor has Plaintiff identified anything in the record that shows that, prior to this appeal, she claimed her weight or obesity affected her functional abilities, including in her application for benefits, hearing testimony, or arguments presented to the Appeals Council (*see* tr. 29–41; 205; 278–81). An ALJ is under no "obligation to investigate

---

[16] Dr. Stringer never used the term "obese" although he frequently described Plaintiff as being "somewhat overweight" and noted weights varying from 202 pounds in June 2006 (tr. 519) to 217 pounds in September 2007 (tr. 467).

a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (citation and internal quotation marks omitted).

While it would have been preferable for the ALJ in this case to have specifically addressed Plaintiff's weight, the court concludes that the ALJ did not err by failing to do so. *See* McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010) (finding no error in ALJ's failure to specifically discuss claimant's obesity where nothing in the medical records indicated that a physician ever placed physical limitations on the claimant's ability to perform work-related functions because of her obesity, and claimant failed to testify at her hearing as to any work-related limitations due to her obesity); James v. Barnhart, 177 F. App'x 875, 878 n.2 (11th Cir. 2006) (indicating that the ALJ did not err by failing to find obesity a severe impairment, where plaintiff did not claim that her obesity was a functional impairment during her hearing testimony and physician who noted plaintiff's obesity did not elaborate on the severity of the condition or conclude that it was a functional impairment. "Thus, there was no medical evidence from which the ALJ could have concluded that [plaintiff's] obesity was a severe impairment."); Ingram v. Astrue, No. 8:07-cv-1591-T-27TBM, 2008 WL 2943287, at *7 (M.D. Fla. July 30, 2008) (concluding that ALJ did not err in failing to specifically address plaintiff's obesity where plaintiff pointed to no evidence, including his own testimony, that suggested his capacity for sedentary work was further reduced by his obesity). *Compare* Early v. Astrue, 481 F. Supp. 2d 1233, 1239–40 (N.D. Ala. 2007) (ALJ erred in failing to consider obesity as a factor in determining claimant's RFC where her treating physicians repeatedly listed "obesity" in their treatment notes).

In sum, for the reasons stated above the court concludes that Plaintiff's claim of error at step two for the failure to identify obesity as a severe impairment is without merit.

2.      Opinions of Treating Physicians Dr. Sullivan and Dr. Stringer

Plaintiff argues that the ALJ erred by refusing to give any weight to Dr. Sullivan's records, in particular his April 14, 2009, CAP form and PCE, which reflect his opinion that Plaintiff is unable to work. Plaintiff further contends that, although the ALJ stated he gave Dr. Stringer's opinion great weight, the ALJ failed to discuss Dr. Stringer's May 11, 2009, CAP form which indicates that Plaintiff suffers disabling pain.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991); <u>Sabo v. Chater</u>, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). Thus, an ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. But, if an ALJ elects "to disregard the opinion of a treating physician, the ALJ must clearly articulate [his] reasons" for doing so. *Id.* at 1241; *see also* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, however, and it is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2).

The ALJ gave no weight to Dr. Sullivan's opinions concerning Plaintiff's musculoskeletal impairments, citing two reasons: (1) there was "no significant, objective evidence in the record" to support the opinions, including "clinical and laboratory abnormalities" and "objective diagnostic examination"; and (2) Dr. Sullivan's treatment appeared to relate primarily to Plaintiff's respiratory impairments, not her spinal or wrist impairments (tr. 20–21).

In support of Plaintiff's contention that the record evidence supports her allegations of disabling pain and, apparently, therefore is supportive of Dr. Sullivan's opinions, Plaintiff points to the July 3, 2007, report which shows an abnormal NCV study indicative of bilateral carpal tunnel syndrome, worse on the right. While the July 3 study does suggest bilateral carpal tunnel syndrome (tr. 284), Dr. Sullivan's records contain no mention whatsoever of examinations for or a diagnosis of carpal tunnel syndrome. Dr. Stringer did make a diagnosis of "probable" carpal tunnel syndrome in November 2008, but his records from December 2008, February 2009, March 2009, April 2009, and May 2009 (*see* tr. 703; 750; 693; 731; 788) do not mention signs or symptoms of carpal tunnel syndrome, much less make a definitive diagnosis of this condition. Thus, with respect to Plaintiff's

carpal tunnel syndrome, the ALJ's refusal to credit Dr. Sullivan's opinion is supported by the record.

Similarly, with respect to Plaintiff's lumbar spine condition, although Plaintiff cites the February 2006 EMG report (which was obtained more than one year prior to her alleged onset date, during which time she continued to work) that shows "findings consistent with posterior primary rami root irritation in the lower lumbar paraspinous region suggestive of radiculopathy," no mention of such diagnosis can be found in Dr. Sullivan's records.  Dr. Stringer's records do discuss this condition; however, his notes from February 2006 through April 2009 consistently report that Plaintiff's back pain was nonradicular (tr. 518; 512; 287; 495; 486; 478; 472; 464; 461; 453; 440; 578; 565; 550; 777; 750; 732).  Moreover, an EMG/NCV study of Plaintiff's left leg conducted in December 2006 was normal (tr. 495), and an EMG/NCV of both legs obtained in December 2008 was also normal (tr. 701).

Plaintiff also points to the June 2007 x-rays of her thoracic and cervical spine and an October 2008 MRI of the lumbar spine.  Neither of these studies, however, provides significant, objective evidence which support Dr. Sullivan's disability opinion.  The June 2007 x-rays shows only minimal spondylosis of Plaintiff's thoracic spine and "very minimal" spondylosis of her cervical spine (tr. 293).  And, while the October 2008 MRI shows degenerative disease at levels L3-4 and L4-5, the disease was considered to be in an "early" stage and any annular tears were "suspect[ed]" and "subtle" (tr. 778).  Furthermore, there was no focal disc protrusion, spinal canal compromise, or foraminal stenosis (*id.*).  The numerous other objective tests that Plaintiff underwent between 2006 and 2009 also do not support Dr. Sullivan's disability opinion.  These include the normal lumbar x-rays obtained in February 2006 (tr. 518); the March 2007 MRI of the lumbar spine that shows only minimal facet degenerative changes with no nerve root compression (tr. 486); the June 2007 lumbar spine x-rays that show degeneration but no acute changes (tr. 480); the July 2007 MRI of the cervical spine that reveals no acute process and only minimal disc bulge at C4-5 (tr. 477); the July 2007 MRI of the lumbar spine that is normal (*id.*); and the October 2008 EMG-NCV study that is normal.

Additionally, as the ALJ observed, Dr. Sullivan mostly treated Plaintiff for respiratory complaints (*see* tr. 392; 390–91; 387; 388; 390; 729; 384; 805).  While Dr. Sullivan noted in October 2006 (tr. 387), and again in April 2007 (tr. 386), that Plaintiff had degenerative disc disease of the lumbar spine, there is no evidence that he evaluated or treated her for this condition at those times.  Also, it appears that the only time that Dr. Sullivan conducted an examination of Plaintiff's spine was

in April 2009, when he noted tenderness of the lumbosacral area, positive straight leg raising tests bilaterally, decreased deep tendon reflexes, and pain with movement (tr. 729). Although there are several references to his writing prescriptions for pain and muscle relaxant medication (*see* tr. 804; 806),[17] there is no evidence that Dr. Sullivan conducted any additional examinations related to Plaintiff's spinal conditions, conducted any examinations at all related to her carpal tunnel condition, or requested or reviewed the results of any objective tests on which he might have based his disability opinion.

For the above reasons, and in light of the record as a whole, the court is satisfied that the objective medical evidence of Plaintiff's neck, back, and wrist conditions, including diagnostic tests and clinical examinations, does not support Dr. Sullivan's opinions of total disability. The ALJ had good cause, and gave adequately articulated reasons which are supported by substantial evidence, for rejecting Dr. Sullivan's disability opinions concerning Plaintiff's musculoskeletal complaints. *See* Phillips, 357 F.3d at 1241.[18]

Plaintiff also complains that in rejecting Dr. Sullivan's opinion the ALJ was required, but failed, to consider the factors specified in 20 C.F.R. § 404.1527(c). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ nevertheless must give it appropriate weight considering the factors set out in § 404.1527(c)(2–6). These factors include (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of

---

[17] Plaintiff contends that the evidence of the pain and muscle relaxant prescriptions she was given—not just from Dr. Sullivan but also from Dr. Stringer—and the high number of lumbar, SI joint, and cervical injections she submitted to by Dr. Stringer provide support for Dr. Sullivan's opinion of total disability. The court concludes, however, this evidence is supportive of a finding that these frequently prescribed conservative measures were generally successful in controlling Plaintiff's symptoms which, in any event, were most often found to be mild to moderate in severity.

[18] The ALJ's rejection of Dr. Sullivan's disability opinion encompasses the recommendation that Plaintiff should never be exposed to environmental hazards. Despite the vagueness of this restriction, given the evidence of Dr. Sullivan's familiarity with and treatment of Plaintiff's respiratory ailments, the court believes the ALJ should have discussed this aspect of his disability opinion separately. His failure to do so is not reversible error, however. The record reflects that Dr. Sullivan's treatment of Plaintiff's respiratory problems generally was conservative. Also, for several years of the period Dr. Sullivan provided care, Plaintiff was able to continue to work, and—notwithstanding one serious episode in January/February 2008 that required hospitalization from which Plaintiff quickly recovered—her respiratory condition  does not appear to have generally worsened after she alleges she became disabled in June 2007. Moreover, the ALJ took Plaintiff's respiratory condition into account, at step two by finding she has the severe impairment of asthma, and at step four when he relied on the VE's testimony that an individual of Plaintiff's description who could only occasionally be exposed to pulmonary irritants, chemicals, and wetness and humidity (tr. 57–58), was able to work as a retail store manager.

the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2–6). Nevertheless, "[n]ot every factor for weighing opinion evidence will apply in every case." Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939, at *5 (S.S.A. 2006).

Here, the ALJ stated that he considered the opinion evidence "in accordance with 20 CFR 404.1527" as well as various Social Security Rulings, including SSR 06–03p (tr. 18), and the court therefore accepts that he did. Moreover, there is no per se rule that requires an articulation of each of the six factors listed in § 404.1527(c)(2)–(6). Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that plaintiff "cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."). In the instant case, where the ALJ adequately explained his reasoning for rejecting Dr. Sullivan's disability opinion, the ALJ did not err by failing to explicitly apply each of the six factors set out in § 404.1527(c) (2)-(6). See Tilley v. Comm'r, 394 F. App'x 216, 222 (6th Cir. 2010) (where ALJ clearly described his reasoning for discounting treating physician's opinion, it was not error for the ALJ to fail to address each of the regulatory factors under § 404.1527(c) (2)–(6)).[19]

For all of the reasons stated above, Plaintiff's argument for reversal on the ground that the ALJ improperly discounted Dr. Sullivan's opinions fails.

Plaintiff also argues that, although the ALJ stated he gave Dr. Stringer's opinion great weight, the ALJ failed to discuss Dr. Stringer's May 11, 2009, CAP form which indicates that Plaintiff suffers disabling pain. Furthermore, Plaintiff contends, because Dr. Stringer was a treating physician, his records are entitled to substantial weight and, to the extent the ALJ did not give Dr. Stringer's opinions controlling weight, he should have applied the factors in § 404.1527(c)(2)–(6). These arguments also fail.

---

[19] The court further notes that Dr. Sullivan's CAP form and PCE—both of which were prepared on pre-printed forms—contain no written explanation for the reasoning behind the choice of circled or checked-off options. Pre-printed forms do not provide persuasive evidence of the validity of the opinions expressed therein. See, e.g., Hammersley v. Astrue, No. 5:08cv245–Oc–10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept.18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")).

As an initial matter, because the factors in § 404.1527(c)(2)–(6) only apply where the ALJ has decided to accord a treating physician's opinion less than controlling weight, and here the ALJ gave Dr. Stringer's opinion great weight, the ALJ did not need to address them. Moreover, as noted above, even where a treating physician's opinion is discounted the ALJ need not go through a factor-by-factor analysis if the ALJ adequately explains his reasoning. Oldham, 509 F.3d at 1258; Tilley, 394 F. App'x at 222. In this case, the ALJ adequately explained and supported his reasoning for rejecting Dr. Sullivan's CAP form, which in significant part is identical to Dr. Stringer's.

The first two responses given by Dr. Stringer on his CAP form are the same as the responses given by Dr. Sullivan, which the court has found the ALJ was entitled to reject due, in part, to a lack of supporting objective diagnostic tests. Moreover, Dr. Stringer's office notes reflect conservative, generally successful treatment in the form of injections, medications, and other therapies for what are most frequently described as mild to moderate physical findings (*see, e.g.*, tr. 512; 511; 495; 489; 486; 309; 479; 478; 472; 464; 461; 460; 440; 578; 577; 566; 565; 551; 550; 547; 544; 769; 701; 751; 692; 732; 789).[20] Dr. Stringer's response to the third statement in the CAP form differs considerably from Dr. Sullivan's response. Dr. Stringer indicated that medication side effects could impose "some limitations" on Plaintiff's ability to work but not to such a degree as to create serious problems, whereas Dr. Sullivan opined that side effects for Plaintiff could be expected to be "severe" enough to limit effectiveness due to distraction, etc. (tr. 727; 785). The more conservative opinion offered by Dr. Stringer is consistent with his medical records, and it is consistent with a finding that the individual described is able to perform work activities.

Thus, even if the ALJ had addressed Dr. Stringer's CAP form, it would not have changed the ALJ's conclusion that Plaintiff does not suffer disabling pain. Furthermore, the ALJ's RFC assessment and the hypothetical question he posed to the VE adequately accounted for Plaintiff's limitations and are supported by substantial evidence.[21] The ALJ was therefore entitled at step four to rely on the

---

[20] To be sure, the record also reflects physical findings of "severe" or "marked" pain or other symptoms with respect to Plaintiff's cervical and lumbar spine condition (*see, e.g.*, tr. 737; 738; 729; 703; 544; 701; 518; 464; 547; 750). In the context of the numerous findings made by Dr. Stringer over the course of several years, however, the reports reflecting findings of a greater degree of pain appear with significantly less frequency than the reports showing "mild" or "moderate" findings.

[21] The court notes that those limitations are the same, or greater, than those which Dr. Holifield, one of the State examiners, found (tr. 675–82). State agency medical consultants are considered experts in the Social Security disability programs, and the ALJ does not err by assigning their opinions greater weight where, as in this case, the

VE's testimony that Plaintiff could perform her past relevant work as a retail store manager. Thus, assuming the ALJ erred by failing to address Dr. Stringer's CAP form, the court concludes that any such error was harmless because the ALJ's ultimate conclusion of "not disabled" would not be altered. *See* Caldwell v. Barnhart, 261 F. App'x 188, 190 (11th Cir. 2008) (stating that "[w]hen . . . an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand."); East v. Barnhart, 197 F. App'x 899, 901 n.3 (11th Cir. 2006) (indicating that failure to mention psychologist's report was harmless where findings in report were consistent with ALJ's ultimate determination); Pichette v. Barnhart, 185 F. App'x 855, 856 (11th Cir. 2006) (finding that ALJ's erroneous statements were harmless where ALJ applied proper legal standard); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (concluding that misstatements were harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant).

## VI. CONCLUSION

Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists. The Commissioner's decision is supported by substantial evidence on the record as a whole and should not be disturbed, 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.

Accordingly, it is **ORDERED** that:

1.      The docket shall reflect that Carolyn W. Colvin has been substituted as the Defendant in this action.

2.      The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**. The clerk is directed to close the file.

---

opinions are supported by the evidence. *See* 20 C.F.R. § 404.1527(f)(2); Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986) (indicating it was not improper for ALJ to consider reports from nonexamining, nontreating physicians when treating physician's opinion was properly discounted); *see also* Ogranaja v. Comm'r of Social Sec., 186 F. App'x 848, 850–51 (11th Cir. 2006) (noting that ALJ may assign greater weight to the opinion of a non-examining physicians that is contrary to the opinion of a treating physician, provided the ALJ properly discounts the treating physician's opinion and the opinion of the non-examining physician is well supported and consistent with the record as a whole).

At Pensacola, Florida this 19th day of September 2013.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**